David E. Bower
**FARUQI & FARUQI, LLP**
10866 Wilshire Blvd., Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
Email: dbower@faruqilaw.com

Lubna M. Faruqi
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: lfarqui@faruqilaw.com

Stuart J. Guber
**FARUQI & FARUQI, LLP**
101 Greenwood Ave., Suite 600
Jenkintown, PA 190465
Telephone: (215) 277-5770
Facsimile: (215) 277-5771
Email: sguber@faruqilaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KOREY BURNAM, Derivatively on Behalf of Nominal Defendant INFOBLOX, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT D. THOMAS, REMO E. CANESSA, RICHARD E. BELLUZZO, DANIEL J. PHELPS, FRANK J. MARSHALL, MICHAEL L. GOGUEN, FRED M. GERSON, and LAURA C. CONIGLIARO, <br><br> Defendants, <br><br> -and- <br><br> INFOBLOX, INC. <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Korey Burnam ("Plaintiff"), by and through his attorneys, derivatively on behalf of nominal defendant Infoblox, Inc. ("Infoblox" or the "Company"), submits this Verified Shareholder Derivative Complaint against the directors and officers named herein (collectively, the "Individual Defendants").  Plaintiff's allegations are based upon personal knowledge as to his own acts and on information and belief as to all other allegations, based on an investigation by counsel, including: (a) review and analysis of public filings made by Infoblox and other persons with the Securities and Exchange Commission ("SEC"), (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Individual Defendants and other persons; (c) review of news articles, shareholder communications, and postings on Infoblox's websites concerning the Company's public statements; and (d) review of other publicly available information concerning Infoblox and other persons.

## SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of nominal defendant Infoblox, by one of its shareholders against the Individual Defendants seeking to remedy defendants' breach of fiduciary duty and other violations of law during the period beginning September 5, 2013, to the present (the "Relevant Period").

2.     Infoblox provides technology that delivers an easy way to maintain a platform for critical network services; offers hardened appliances and security optimized software that eliminate the risk of security vulnerabilities; and eliminates human error, reducing workload and increasing efficiency with integrated network automation.  Infoblox is used by companies including Visa, Chevron, Starbucks, Audi and Barclays.  Infoblox provides solutions to help the federal government connect end users, devices, and networks while reducing costs, increasing security and maximizing uptime.

3.     Defendants' violations arise from a course of misconduct whereby Defendants permitted and sometimes directly participated in the dissemination of false and misleading statements to the investing public concerning the Company's reported financial performance and

condition and future prospects.  Specifically, on September 5, 2013, Infoblox reported financial and operating results for the fourth quarter and year ended July 31, 2013.  The Company announced record net revenue of $63.1 million for the quarter, higher than the approximately $58 million predicted.  The Company achieved 40% year-over-year revenue growth.  Net revenue for fiscal year 2013 was a record $225 million, higher than the $220 to $221 million previously predicted.

4.   From September 5, 2013 to February 10, 2014, Defendants continued to issue false and misleading statements regarding the Company's growth in revenues and financial prosperity and continued to represent to the investing public that the Company did not engage in discounting in order to "win deals".

5.   At the same time that Defendants were portraying Infoblox as a thriving company with a bright future, the exact opposite was true. Infoblox was facing increased competition from aggressive price competitors and a downturn in its business with the federal government.  As a result, Defendants were engaging in an unsustainable practice of extreme discounting in order to temporarily increase revenues in the short term in order to maintain the appearance that its revenue stream was sustainable and robust while concealing the Company's deep discounting practices from the investing public.

6.   While in possession of this material adverse, non-public information regarding the Company, six of the seven members of senior management and five of seven Company Board members collectively sold over $1 million shares of their personally held shares of Company stock generating proceeds of more than $39.4 million. In fact, three of the Board members, Defendants Fred Gerson ("Gerson"), Daniel J. Phelps ("Phelps") and Frank Marshall ("Marshall") sold out their entire holdings. A fourth, Michael L. Goguen ("Goguen") sold over 90% of his holdings, garnering over $9 million in proceeds from such sales. The fifth, Defendant Robert Thomas ("Thomas"), who was also the Company's President and Chief Executive Officer ("CEO") along with being a Board member, sold almost $9 million of his Company stock. Four of these Defendants making up a majority of the current Board are current members of the Board, including

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Defendants Thomas, Gerson, Phelps and Goguen, all of whom are incapable of rendering an

2   impartial decision on a demand made on the Board as they are all infected by their insider trading

3   transgressions. Defendant Thomas as a Company insider is also not independent and thus,

4   incapable of considering a litigation demand.

5        7.    The Company made a partial disclosure on February 10, 2014, when Infoblox

6   stunned the market when it issued a press release revealing that it was lowering its revenue and

7   earnings guidance due to weaker demand.  Specifically, the Company announced that it now

8   expected to earn 30 to 34 cents per share on revenue of $250 million to $254 million for the full

9   year, well below its previously forecasted earnings of 44 to 54 cents per share on revenue of $270

10  to $276 million. In the wake of this disclosure, Infoblox's stock plummeted, dropping nearly 50%

11  from $33.14 per share to $17.19 per share on February 11, 2014 – wiping out nearly $850 million

12  of the Company's market capitalization in one day.

13       8.    Infoblox finally held a belated earnings conference call concerning its 2014 second

14  quarter results with investors on February 26, 2014.[1]  On the earnings call, Defendant Thomas,

15  Infoblox's then current President, CEO and a member of the Board, admitted for the first time

16  publicly that Infoblox had been engaging in extensive discounting in order to win deals from

17  competitors in order to maintain the Company's revenue stream, thus affecting the Company's

18  revenues and profits.  Although Thomas tried to dismiss this as a "standard" business practice, it

19  was unknown to the investing public who would have recognized the potential material adverse

20  effect such discounting could have on current and future revenues and profits.

21       9.    At the same time the Company's policy of deep discounting went undisclosed,

22  Defendant Thomas sold over 200,000 shares in the Company's 2014 Fiscal Year 1Q during a two-

23  week period in September 2013 for proceeds of almost $9 million. These sales occurred the quarter

24  prior to the Company's disastrous 2014 Fiscal Year 2Q where Infoblox suffered unexpected poor

25

26  
27  [1] The Company's Fiscal Year ended on July 31, 2013. The Company's Fiscal Year 2014 second quarter ended on January 31, 2014.

28  
4
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

operating results, which were ultimately reported on February 11, 2014, causing the stock to lose over half its value in one day of trading.

10.     On May 29, 2014, Infoblox issued a press release reporting its financial results for its 2014 Fiscal Year 3Q ended April 30, 2014.  The Company reported a net loss of $7.4 million and total net revenue of $61 million, which Defendant Thomas remarked was at the "low-end of our guidance range of $61 million to $62 million."

11.     Immediately following the disclosure of Infoblox's poor third quarter financials, on May 29, 2014, the Company issued a press release announcing that Thomas was stepping down from his management and board positions but would remain in those positions until a successor was appointed.  On this news, shares of Infoblox declined $7.56 per share, nearly 37%, to close on May 30, 2014, at $12.96 per share.

12.     As a result of these revelations, the Company is now subject to three class action securities lawsuits with the longest time frame alleging violations of the federal securities laws on behalf of purchasers of Infoblox stock being from September 5, 2013 to May 29, 2014 (the "Class Period").  These cases are currently pending in the United States District Court for the Northern District of California (hereinafter the "Securities Class Actions").[2]

13.     Throughout the Class Period, the Individual Defendants as officers and/or directors of Infoblox either knew, consciously disregarded, were reckless or grossly negligent in not knowing the true facts regarding the Company's financial health, business, operations and prospects.  In blatant disregard of and in breach of their fiduciary duties, the Individual Defendants misrepresented and failed to disclose adverse facts, which they either knew, consciously disregarded, were reckless or grossly negligent in not knowing, including that: (1) the Company was discounting heavily to attract business; (2) that as a result, the Company's revenue and earnings guidance were grossly overstated; (3) thereby rendering Defendants' positive statements

---

[2] These cases are docketed as: (1) *Beqaj et al. v. Infoblox, Inc., et al.*, Case No.: 3:14-cv-02564; (2) *Achey et al. v. Infoblox, Inc., et al.*, Case No.: 3:14-cv-02644; and (3) *Ansfield et al. v. Infoblox, Inc.*, et al., Case No.: 3:14-cv-02500.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

about the Company's business, operations and prospects materially false and misleading and/or lacking a reasonable basis and were motivated by Defendants' desire to inflate Infoblox's stock price so that an overwhelming majority of the Company's senior management and its Board, many of whom are Defendants here, could sell their shares at artificially inflated prices for their own personal gain at the expense of the investing public.

14.     Infoblox's Board has not, and will not commence litigation against the Individual Defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Infoblox for making, authorizing, or failing to correct the false and misleading statements alleged herein and/or engaging in insider trading while in possession of adverse non-public information. Such widespread insider trading amongst senior management and the Board demonstrates that the deep discounting in order to "win deals" for the Company as part of its business plan and concealed from the investing public was well known throughout the Company, including by the minority of senior management and Board members who did not engage in insider trading. Accordingly, a pre-suit demand upon Infoblox's Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate Infoblox's rights against its wayward fiduciaries and hold them responsible for the damages they have caused and continue to cause Infoblox.  More specifically, Plaintiff brings this derivative action to, among other things, recover damages, including but not limited to, fees, costs, loss of goodwill and business opportunities, as well as loss of market value and shareholder equity, caused by the Individual Defendants' unlawful courses of conduct and breaches of fiduciary duty, disgorgement to the Company of certain Defendants' illicit insider trading proceeds, clawback of compensation for breach of their fiduciary duties, and requiring the Company to reform and improve its corporate governance and internal procedures to protect Infoblox and its shareholders from a repeat of the damaging events described herein.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 │ exceeds the sum or value of $75,000.00. This is not a collusive action designed to confer

2 │ jurisdiction on a court of the United States that it would not otherwise have.

3 │       16.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 and 28 U.S.C. § 1401

4 │ because one or more of the defendants either resides in or maintains executive offices in this

5 │ District, a substantial portion of the transactions and wrongs complained of herein, including

6 │ defendants' primary participation in the wrongful acts detailed herein and aiding and in violation

7 │ of fiduciary duties owed to Infoblox occurred in this District, and defendants have received

8 │ substantial compensation in this District by doing business here and engaging in numerous

9 │ activities that have an effect in this District.

10 │ ## PARTIES

11 │       17.     Plaintiff is currently a stockholder of the Company and has continuously been a

12 │ stockholder of Infoblox during the relevant times hereto. Plaintiff is a resident of the State of

13 │ Georgia.

14 │       18.     Nominal Defendant Infoblox is a global technology company, incorporated in

15 │ Delaware.  Infoblox was founded in Illinois in 1999.  In May 2003, the Company was

16 │ reincorporated in Delaware.  Infoblox maintains its headquarters and principal place of business in

17 │ Santa Clara, California.  Infoblox sells products that manage and protect networks.  Infoblox

18 │ represents that it provides a broad family of enterprise and service provider class solutions to over

19 │ 7,000 enterprises and service providers with a goal of making customer networks more available,

20 │ secure and automated.  Throughout the Class Period, Infoblox traded in an efficient market on the

21 │ New York Stock Exchange ("NYSE") under the ticker symbol "BLOX."  As of February 28, 2014,

22 │ the Company had over 53.87 million shares outstanding.

23 │       19.     Defendant Thomas has been President, CEO and a member of the Board of

24 │ Directors from September 2004 through the present.  Thomas decided to step down as President,

25 │ CEO and as a member of the Board on May 29, 2014, but remains in those positions pending the

26 │ appointment of his successor. Thomas is described as being responsible for "building Infoblox into

27 │ a highly profitable and valued business."  During the Class Period, because of Thomas's positions,

28 │

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  he either knew, consciously disregarded, was reckless or grossly negligent in not knowing the true

2  facts regarding the adverse, non-public information about the business of Infoblox, as well as its

3  finances, markets and present and future business prospects, via access to internal corporate

4  documents, conversations and connections with other corporate officers and employees, attendance

5  at Board and management meetings and committees thereof and via reports and other information

6  provided to him in connection therewith.  Thomas participated in the issuance of false and/or

7  misleading statements, including the preparation of the false and/or misleading press releases and

8  SEC filings.  During the Class Period, Thomas sold 207,565 shares of Infoblox stock for proceeds

9  of $8,849,507.  Upon information and belief, Thomas is a citizen of California.

10         20.    Defendant Remo E. Canessa ("Canessa") has been the Company's Chief Financial

11  Officer ("CFO") and the Company's Principal Accounting Officer since October 2004.  Canessa is

12  described as being responsible for managing the finance and IT functions at the Company.

13  Because of Canessa's positions, he either knew, consciously disregarded, was reckless or grossly

14  negligent in not knowing or should have known the true facts regarding the adverse, non-public

15  information about the business of Infoblox, as well as its finances, markets and present and future

16  business prospects, via access to internal corporate documents, conversations and connections with

17  other corporate officers and employees, attendance at Board and management meetings and

18  committees thereof and via reports and other information provided to him in connection therewith.

19  Canessa participated in the issuance of false and/or misleading statements, including the

20  preparation of the false and/or misleading press releases and SEC filings.  During the Relevant

21  Period, Canessa sold 94,000 shares of Infoblox stock for proceeds of $4,036,988.   Upon

22  information and belief, Canessa is a citizen of California.

23         21.    Defendant Richard E. Belluzzo ("Belluzzo") has been a director of Infoblox since

24  January 2013 and is a member of the Compensation Committee.  Since November 2012 to present,

25  Belluzzo has served as the Chairman of JDS Uniphase Corporation and has served as one of its

26  directors since 2005.  Belluzzo also serves as a Strategic Advisor for the Gores Group, a private

27  equity firm.  Belluzzo is also a member of the board of directors and audit committee of PMC-

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Sierra. As a member of the Board, Belluzzo either knew, consciously disregarded, was reckless or

2   grossly negligent in not knowing the true facts regarding the adverse, non-public information about

3   the business of Infoblox, as well as its finances, markets and present and future business prospects,

4   via access to internal corporate documents, conversations and connections with other corporate

5   officers and employees, attendance at Board meetings and committees thereof and via reports and

6   other information provided to him in connection therewith.  Belluzzo participated in the issuance

7   of false and/or misleading statements, including the preparation of the false and/or misleading

8   press releases and SEC filings.  Upon information and belief, Belluzzo is a citizen of California.

9          22.     Defendant Phelps has been a director of Infoblox since September 2000 and is a

10   member of the Audit Committee.  Phelps is described by the Company as the "audit committee

11   financial expert."  Phelps has also served as managing director of Salt Creek Capital, a private

12   equity firm, since he founded the firm in July 2009.  As a member of the Board, Phelps either

13   knew, consciously disregarded, was reckless or grossly negligent in not knowing the true facts

14   regarding the adverse, non-public information about the business of Infoblox, as well as its

15   finances, markets and present and future business prospects, via access to internal corporate

16   documents, conversations and connections with other corporate officers and employees, attendance

17   at Board meetings and committees thereof and via reports and other information provided to him in

18   connection therewith.  Phelps participated in the issuance of false and/or misleading statements,

19   including the preparation of the false and/or misleading press releases and SEC filings. During the

20   Class Period, Phelps sold his entire holdings of 7,000 shares of Infoblox stock for proceeds of

21   $249,200.  Upon information and belief, Phelps is a citizen of California.

22          23.      Defendant Goguen has been a director of Infoblox since April 2003 and the

23   chairman of the Board since April 2012.  He is also a member of the Compensation Committee.

24   Since 1996, Goguen has held various positions at Sequoia Capital, a venture capital firm, and has

25   been a general partner since 1997. As a member of the Board, Goguen either knew, consciously

26   disregarded, was reckless or grossly negligent in not knowing the true facts regarding the adverse,

27   non-public information about the business of Infoblox, as well as its finances, markets and present

28

1  and future business prospects, via access to internal corporate documents, conversations and

2  connections with other corporate officers and employees, attendance at Board meetings and

3  committees thereof and via reports and other information provided to him in connection therewith.

4  Phelps participated in the issuance of false and/or misleading statements, including the preparation

5  of the false and/or misleading press releases and SEC filings.  During the Class Period, Goguen

6  sold 316,152 shares of Infoblox stock (representing 90% of his entire holdings) for proceeds of

7  $9,219,269.  Upon information and belief, Goguen is a citizen of California.

8          24.      Defendant Gerson has been a director of Infoblox since November 2011 and is the

9  chair of Audit Committee and a member of the Compensation Committee.  Gerson is described by

10  the Company as the "audit committee financial expert."   Gerson also serves on the board of

11  trustees of Thomas Jefferson School of Law since June 2013. As a member of the Board, Gerson

12  either knew, consciously disregarded, was reckless or grossly negligent in not knowing the true

13  facts regarding the adverse, non-public information about the business of Infoblox, as well as its

14  finances, markets and present and future business prospects, via access to internal corporate

15  documents, conversations and connections with other corporate officers and employees, attendance

16  at Board meetings and committees thereof and via reports and other information provided to him in

17  connection therewith.  Gerson participated in the issuance of false and/or misleading statements,

18  including the preparation of the false and/or misleading press releases and SEC filings. During the

19  Class Period, Gerson sold his entire holdings of 11,000 shares of Infoblox stock for proceeds of

20  $391,950.  Upon information and belief, Gerson is a citizen of California.

21          25.      Defendant Laura C. Conigliaro ("Conigliaro") has been a director of Infoblox since

22  January 2012 and is a member of the nominating and corporate governance committee and the

23  Audit Committee.  Conigliaro has served as a member of the board of directors of Dell, Inc. and

24  has been a member of its finance committee since September 2011.  Conigliaro has also served on

25  the board of directors of Genpact Limited since May 2013 and is a member of its audit committee.

26  As a member of the Board, Conigliaro either knew, consciously disregarded, was reckless or

27  grossly negligent in not knowing the true facts regarding the adverse, non-public information about

28

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    the business of Infoblox, as well as its finances, markets and present and future business prospects,

2    via access to internal corporate documents, conversations and connections with other corporate

3    officers and employees, attendance at Board meetings and committees thereof and via reports and

4    other information provided to him in connection therewith.  Conigliaro participated in the issuance

5    of false and/or misleading statements, including the preparation of the false and/or misleading

6    press releases and SEC filings. Upon information and belief, Conigliaro is a citizen of New York.

7          26.     Defendant Marshall is the former chair of the Company's Nominating and

8    Corporate Governance Committee and was a member of the Board of Directors from March 2004

9    until the expiration of his term in December 2013.  Marshall has been a general partner at Big

10    Basin Partners since October 2000 and also serves as a director and advisor for several private

11    companies. As a member of the Board, Marshall either knew, consciously disregarded, was

12    reckless or grossly negligent in not knowing the true facts regarding the adverse, non-public

13    information about the business of Infoblox, as well as its finances, markets and present and future

14    business prospects, via access to internal corporate documents, conversations and connections with

15    other corporate officers and employees, attendance at Board meetings and committees thereof and

16    via reports and other information provided to him in connection therewith.  Marshall participated

17    in the issuance of false and/or misleading statements, including the preparation of the false and/or

18    misleading press releases and SEC filings.  During the Class Period, Marshall sold his entire

19    holdings of 15,856 shares of Infoblox stock for proceeds of $480,590.  Upon information and

20    belief, Marshall is a citizen of Washington.

21          27.     Defendants Thomas, Marshall, Phelps, Belluzzo, Goguen, Gerson and Conigliaro

22    are sometimes collectively referred to herein as the "Director Defendants."

23          28.     Defendants Gerson, Conigliaro and Phelps are sometimes collectively referred to

24    herein as the "Audit Committee Defendants."

25          29.     Defendants Goguen, Belluzzo and Gerson are sometimes collectively referred to

26    herein as the "Compensation Committee Defendants."

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

30.     Defendants Conigliaro and Marshall are sometimes collectively referred to herein as the "Nominating and Corporate Governance Committee Defendants."

31.     Defendants Thomas, Belluzzo, Phelps, Goguen, Gerson and Conigliaro are sometimes collectively referred to as the "Current Director Defendants." In addition, there are currently seven Board members. Non-party Philip Fasano is the seventh director.

32.     Defendants Thomas, Canessa, Marshall, Phelps, Belluzzo, Goguen, Gerson and Conigliaro are sometimes collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise prudent and reasonable supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a)   exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b)   exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority; and

c)   refrain from acting upon material inside corporate information to benefit themselves.

36.   Infoblox maintains a set of Corporate Governance Guidelines, which apply to Infoblox's Board.  The Guidelines state that the role of the Directors is as follows:

The Board monitors both the performance of the Company (in relation to its financial objectives, major goals, strategies and competitors) and the Company's long-term strategic business plans, as well as other pertinent issues affecting the business of the Company.  The Board also elects corporate officers, acts as the management team's advisor and monitors its performance.  The Board assesses risks facing the Company and management's approach to addressing such risks. The Board oversees the Company's program to prevent and detect violations of law, regulation and Company policies and procedures.  The Board reviews and, if appropriate, approves significant transactions.

37.   Additionally, all director, officers and employees of Infoblox are required to adhere to the Company's Code of Conduct (the "Code").  The Code states:

**ETHICAL CONDUCT**
Infoblox has built its business on the quality of its products and services and the performance of its employees.  Our continuing success depends upon the quality of Infoblox members, who adhere to the highest standards of honesty, ethics and fairness in our business dealings.  We insist on not only ethical dealings with others, but on the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

**FAIR DEALING**
Officers and employees are required to deal honestly, ethically and fairly with customers, suppliers, competitors and other third parties.  We:

• Prohibit offering or making bribes, payoff, kickbacks or any other form of improper payment, regardless of whether such offer or payment is made directly or indirectly through third parties;

13
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Prohibit our officers and employees from accepting any bribe, payoff, kickback or improper payment from anyone;
- Prohibit any payments, gifts, entertainment, or promotional expenses, regardless of their value, which are offered for an improper purpose or which may violate any local or U.S. laws;
- Limit marketing and client entertainment expenditures to those that are necessary, prudent, job related and consistent with our policies;
- ***Require clear and precise communication in our contracts, advertising, literature and other public statements and seek to eliminate misstatements of fact or misleading impressions***;
- Reflect accurately on all invoices to customers the sale price and terms of sale for products sold or services rendered;
- Protect all proprietary data our customers or suppliers provide to us as reflected in our agreements with them or as compelled by law; and
- Prohibit our representatives from otherwise taking unfair advantage of our customers or suppliers, or other third parties, through manipulation, concealment, abuse of privileged information or any other unfair-dealing practice. (Emphasis added.)

**CONFIDENTIALITY AND CORPORATE ASSETS AND CORPORATE OPPORTUNITIES**

**Infoblox members are, on occasion, entrusted with Infoblox confidential information** and with the confidential information of Company suppliers, customers or other business partners**. This information may include:** (1) technical or other information about current and future products, services or research; **(2) business or marketing plans or projections; (3) earnings and other internal financial data;** (4) personnel information; (5) supply and customer lists; and (6) other non-public information that, if disclosed, might be of use to competitors, or harmful to the Company's suppliers, customers or other business partners.  This information is the property of Infoblox, or the property of its suppliers, customers or business partners, and in many cases was developed at great expense.  All Infoblox members, upon commencement of employment with Infoblox, shall sign an agreement to protect and hold confidential Infoblox's proprietary information.  Strict adherence to that agreement is required of each Infoblox member.

Infoblox members shall not take for themselves, or for family members or any other entities with which they are affiliated, any opportunity of which they become aware through the use of Company property or information, or through their position with the Company, and shall not use Company property or information, or their position with the Company, for personal gain other than actions taken for the overall advancement of the interests of the Company. (Emphasis added.)

14
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**SPECIAL ETHICS OBLIGATIONS FOR INFOBLOX MEMBERS WITH FINANCIAL REPORTING RESPONSIBILITIES**

**As a public company it is of critical importance that the Infoblox filings with the Securities and Exchange Commission (the "SEC") and its other disclosures to the public be accurate and timely.  Depending on their position, Infoblox members may be called upon to provide information to assure that the Company's public reports are complete, fair and understandable.**  All personnel are to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to public disclosure requirements.

**The Chief Executive Officer, Chief Financial Officer,** Vice President, Finance and Corporate Controller, and Finance Department personnel bear a special responsibility for promoting integrity throughout the organization, with responsibilities to stakeholders both inside and outside of Infoblox.  The Chief Executive Officer, Chief Financial Officer, Vice President, Finance and Corporate Controller and members of the Finance Department have a special role both to adhere to these principles themselves and also to ensure that a culture exists throughout Infoblox as a whole that ensures the fair, accurate, comprehensive and timely reporting of financial results.   Because of this special role, the Chief Executive Officer, Chief Financial Officer, Vice President, Finance and Corporate Controller, and all members of the Finance Department are bound by the following:

- Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships;

- **Provide information that is accurate, complete, objective, timely and understandable to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that Infoblox files with, or submits to, government agencies and in other public communications;**

- Comply with applicable governmental laws, rules and regulations, and acquire appropriate knowledge of such laws, rules and regulations relating to Infoblox's duties sufficient to enable the Infoblox member to recognize potential dangers and to know when to seek legal advice;

- **Promptly report to the General Counsel and/or the Audit Committee Chair any conduct believed to be a violation of law or business ethics or of any provision of this Code, including any transaction or relationship that reasonably could be expected to give rise to such a conflict;** and

- Promote accountability to this Code among all Infoblox members. (Emphasis added).

38.     In addition to the general duties described above, the Audit Committee Defendants owed additional duties.  Under the Audit Committee Charter, as adopted on February 21, 2012, defendants Gerson, Conigliaro and Phelps owed specific duties to Infoblox to assist the Board in fulfilling its oversight responsibilities.  Among other things, the Audit Committee was given the responsibility of: (1) reviewing and discussing with the Company's management and the independent auditors their periodic reviews of the integrity, effectiveness and adequacy of the Company's accounting and financial reporting processes, systems of internal control, any special steps adopted in light of material control deficiencies and review, prior to filing of the Company's Form 10-K and the attestations or reports by the independent auditors relating to such report; (2) review and provide oversight with respect to the external audit and the Company's relationship with its independent auditors; (3) review any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee; and (4) discuss generally with the Company's management and the independent auditor, as appropriate, the type of information to be disclosed and type of presentation to be made regarding the Company's earnings press releases, financial information and earnings guidance released to analysts and rating agencies.

39.     Similarly, the members of the Compensation Committee, defendants Goguen, Belluzzo and Gerson, owed additional duties.  As set forth in the Company's 2013 Proxy Statement and in the Compensation Committee Charter, amended on May 21, 2013, the Compensation Committee is responsible for, among other things, the following:

- **Reviewing, approving and determining, or making recommendations to the Board regarding, the compensation of Infoblox's executive officers;**

- Administering the stock and equity incentive plans;

- **Reviewing and approving and making recommendations to the Board regarding incentive compensation and equity plans;** and

- Establishing and reviewing general strategies relating to compensation and benefits of employees. (Emphasis added).

16

1

**FACTUAL ALLEGATIONS**

2

**Company Background**

3      40.    Infoblox states that it provides technology that delivers an easy way to maintain a

4 platform for critical network services; offers hardened appliances and security optimized software

5 that eliminate the risk of security vulnerabilities, and; eliminates human error, reducing workload

6 and increasing efficiency with integrated network automation.

7      41.    According to the Company's website, Infoblox is used by companies including

8 Visa, Chevron, Starbucks, Audi, Barclays and Boeing.  Infoblox provides solutions to help "the

9 federal government connect end users, devices and networks while reducing costs, increasing

10 security and maximizing uptime."  As the claimed market leader in automated network control,

11 Infoblox provides services and solutions to every cabinet-level agency.

12

**Defendants' False and Misleading Statements and Omissions of Material Facts**

13      42.    Unbeknownst to investors, Infoblox's financial condition and future financial

14 results were materially overstated throughout the Relevant Period.  Throughout the Relevant

15 Period, Infoblox maintained that its financial and business outlook was healthy and robust.

16      43.    The Individual Defendants, because of their connections to and positions within the

17 Company, possessed the power and authority to control the contents of Infoblox's quarterly

18 reports, press releases and presentations to the market, including securities analysts, money and

19 portfolio managers and investors.  Because of their positions within the Company, and their access

20 to material non-public information available to them but not to the public, the Individual

21 Defendants either knew, consciously disregarded, were reckless or grossly negligent in not

22 knowing the true facts regarding  the adverse, non-public information about the business of

23 Infoblox, as well as its finances, markets and present and future business prospects, via access to

24 internal corporate documents, conversations and connections with other corporate officers and

25 employees, attendance at management and/or Board meetings and committees thereof and via

26 reports and other information provided to them in connection therewith.

27

28

17

44.     On September 5, 2013 (the first day of the Class Period), Infoblox reported financial and operating results for the fourth quarter and year ended July 31, 2013.  The Company announced record net revenue of $63.1 million for the quarter, higher than the approximately $58 million predicted.  The Company achieved 40% year-over-year revenue growth.  Net revenue for fiscal year 2013 was a record $225 million, higher than the $220 to $221 million previously predicted.  As set forth below, Infoblox's public statements strongly suggested that the Company only obtained these high revenues by "discounting enormously to get deals," a fact it misrepresented and concealed in earnings calls and financial filings during the Class Period and would only reveal on a February 26, 2014 earnings call months later.

45.     In a press release dated September 5, 2013, Defendant Thomas made the following statements:

> "By all measures, Infoblox had another outstanding quarter and another very strong fiscal year," said Robert Thomas, president and chief executive officer.  "Revenue in the fourth quarter increased 40% year-over year and was driven by strong product sales, which were up 52% year-over-year.  From a bottom-line perspective, we reported solid non-GAAP operating profitability while still investing significantly in our business.  Going forward, *we enter fiscal 2014 with significant momentum and expect it to be another year of strong execution.*"  (Emphasis added).

46.     Defendant Canessa added the following statement:

> "In the quarter, we saw solid growth across all three geographies," said Remo Canessa, chief financial officer.  "Our investments in sales and marketing have expanded our geographic reach and opportunities in the market, and we are pleased with the return on these investments."

47.     Infoblox also held a Fourth Quarter Earnings Call on September 5, 2013.[3]  During this call, Defendants Thomas and Canessa lauded the Company's revenue growth and positive results for the fourth quarter of fiscal year 2013.  Defendant Thomas extolled 2013 as a "year of

---

[3] A transcript of the Earnings Call can be found at http://seekingalpha.com/article/1677162-infoblox-management-discusses-q4-2013-results-earnings-call-transcript?page=1.

tremendous achievement."  He disclosed that annual revenue grew 33% of $225 million, with a product revenue increase of 35% to 128.2 million, and claimed that Infoblox's revenue performance was unmatched by almost all of its networking peers.  Defendant Thomas provided the following additional details:

> We also expanded our total addressable market by introducing new security solutions and the Trinzic 100 Network Edge Appliance.  From a bottom line standpoint, we improved operating profitability while still investing significantly in our business.  Our results demonstrate that our vision and strategy are on target and we have the right products to help our customers gain control in today's highly dynamic network environments.
>
> And now turning to the fourth quarter.  We are very pleased with the results that we have reported.  Fourth quarter revenue increased 40% year-over-year and 9% sequentially to a record $63.1 million.  Revenue growth in the quarter was driven by strong product sales, which were up 52% year-over-year and 9% sequentially.  We also reported solid profitability in the quarter, with total gross margin at 79%, operating margin at 12.3% and EPS of $0.14 a share.
>
> In the fourth quarter, we saw a number of great trends.  From a geographic perspective, all 3 regions had an outstanding quarter.  Complementing the strong demand from our existing customer base, we added approximately 200 new customers in the quarter, bringing our cumulative count to over 6,700.

48.    Defendant Canessa further made the following statements during the Earnings Call:

> For the October quarter, we expect revenue to be in the range of $62.5 million to $63.5 million or a year-over-year growth of 26% to 28%.  We are targeting gross margin to be approximately 78%.  We anticipate operating margin to be between 8% and 9% and we expect EPS to be between $0.08 to $0.09, using 56.8 million shares.
>
> For our fiscal year 2014, we expect revenue to be in the range of $270 million to $276 million or a year-over-year growth of 20% to 23%.  We anticipate operating margin to be between 10% to 12%.  We expect EPS to be in the range of $0.44 to $0.55, using 57.3 million shares.
>
> In closing, we are very pleased with the return we are seeing from our marketing, sales force and channel investments and the continuing improvements to our business model.  I believe our July quarter and fiscal 2013 results are strong evidence of the success of these investments and efforts.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

49.     With respect to discounting, the following exchange occurred between Defendant Canessa and analyst Erik Suppiger from JMP Securities LLC during the call:

> Suppiger: Okay. In terms of the gross margin, did you see any change in terms of market dynamics around pricing? Was that part of the gross margin upside or was it all mix shift?
>
> Canessa: it was all mix. We take a look at discounting on a quarter to quarter basis, Q3, Q4, there's really no change.

50.     In addition, the following exchange regarding discounting occurred between Defendant Thomas and Alexander B. Henderson from Needham & Company, LLC:

> Henderson: Just one last question for me. Your pricing environment is still fairly mundane. It sounds like you're still not seeing a lot of pressure for discounts and the like, even in volume environments, is that accurate?
>
> Defendant Thomas: Yes, that is accurate. I think our average discount in Q4 was maybe a tiny bit down over Q3, but not enough to say there was any change one way or the other.

51.     Defendants Thomas and Canessa's September 2013 statements were positive for investors since they reversed an earlier disclosure that discounting might be required. The fact that the Company, as of September 2013, did not see the need for discounting buoyed investors, resulting in an immediate significant stock price increase.

52.     Defendant Thomas and Defendant Canessa's statements were false and misleading based on the information known or consciously disregarded, and were motivated by the desire to inflate Infoblox's stock price so that senior management and the Board could sell their shares at a substantial personal profit.

53.     In response to the September 5, 2013 earnings announcements and the Earnings call, Infoblox's stock price jumped $5.45 per share, from $35.24 on September 5, 2013 to $40.69 per share on September 6, 2013. This represents a significant 15.5% increase in the stock price in a single day.

54.     Defendants Thomas, Canessa, Gerson, Goguen, Marshall and Phelps and other members of senior management immediately capitalized on these false and misleading

representations.  Notwithstanding Thomas and Canessa's public projections of increased revenue and financial prosperity for Infoblox, ten company insiders sold over one million shares for gross proceeds of over $40 million during an eight month period from September 9, 2013 through May 29, 2014. In addition to the above-named Individual Defendants, the following members of senior management also engaged in insider sales: David Nicholas Gee (Executive Vice President-Marketing), Stephen Nye Wendell (Executive Vice President-Product Strategy), Christopher J. Andrews (Executive Vice President-Worldwide Field Operations) and Sohail M. Parekh (Executive Vice President-Engineering)

55.    The dramatic increase in September sales by Company insiders and members of the Board are illustrated by the following graphs:



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   56.    On September 30, 2013, the Company filed an annual report for the year ended July

2   31, 2013 on Form 10-K with the SEC.   The 2013 10-K was signed by Defendants Thomas,

3   Canessa, Belluzzo, Conigliaro, Gerson, Goguen, Marshall and Phelps.   The Company's Annual

4   Report incorporated and reiterated the Company's prior false and misleading financial results and

5   disclosures.

6   57.    In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-

7   Oxley Act of 2002 ("SOX") by Defendants Thomas and Canessa, stating that the financial

8   information contained in the Form 10-K was accurate and it fairly presented, in all material

9   respects, the financial condition and results of operations of the Company.   The Form 10-K

10  contained additional certifications by Defendants Thomas and Canessa asserting that the report

11  ***"does not contain any untrue statement of a material fact or omit to state a material fact***

12  ***necessary to make the statements made, in light of the circumstances under which such***

13  ***statements were made, not misleading with respect to the period covered by this report[.]"***

14  (Emphasis added).

15  58.    On November 26, 2013, after the close of the markets, Infoblox issued a press

16  release announcing its financial and operating results for the quarter ended October 31, 2013.

17  Total net revenue for the first quarter ("Q1") of fiscal 2014 was a record $63.5 million, an increase

18  of 28% on a year-over-year basis.   The Company stated that it was pleased with the results and

19  expected a strong start to 2014.   The press release contained the following false and misleading

20  statements made by Defendants Thomas and Canessa as to Infoblox's financial results and

21  outlook:

22      Thomas: ***"I am pleased with our results and the strong start to fiscal 2014***…In the
23      first quarter, revenue increased 28% year-over-year to a record $63.5 million, and
        product revenue grew 33% year-over-year to $36.0 million.   Complementing the
24      strong demand from our existing customers, our cumulative customer count reached
        approximately 6,900 customers in the first quarter.   As we look forward, we believe
25      that Infoblox is well positioned to leverage its technology leadership by expanding
        our solutions in the areas where CIOs are investing today, while accelerating the
26      market's awareness and adoption of our automated network control solutions."
27      (Emphasis added).

28
                                              22

Canessa:   ***"We executed well in the first quarter and saw solid year-over-year revenue growth in all three geographies***…From a bottom line perspective, we achieved 12.1% non-GAAP operating margin and non-GAAP earnings per share of $0.12, which were better than we previously expected." (Emphasis added).

59.    Infoblox did not execute well in the first quarter and was not well positioned to leverage its technology leadership.  Among other problems it had not acknowledged, Infoblox's revenues were obtained by aggressive price discounting that it was continuing to conceal from analysts and investors.

60.    The November 26, 2013 Press Release also set forth the following misleading financial projections for the second fiscal quarter ending January 31, 2014:

- Total net revenue in the range of $65 million to $66 million;

- Non-GAAP gross margin to be between 78% to 79%;

- Non-GAAP operating margin in the range of 9% to 11%; and

- Non-GAAP diluted net income per share ("non-GAAP EPS") to be in the range of $0.09 to $0.11, assuming approximately 58.5 million shares on a non-GAAP diluted weighted average share basis.

61.    The Press Release also set forth the following misleading financial projections for the fiscal year ending July 31, 2014:

- Total net revenue in the range of $270 million to $276 million;

- Non-GAAP operating margin in the range of 10.5% to 12.5%; and

- Non-GAAP EPS to be in the range of $0.44 to $0.54, assuming approximately 58.5 million shares on a non-GAAP diluted weighted average share basis.

62.    Indeed, Infoblox continued to misrepresent its discounting practices during a November 26, 2013 Earnings Call.  With respect to discounting, the following exchange occurred between Defendant Thomas and analyst Sanjit Singh from Wedbush Securities Inc.:

Singh:  Can I get an update on the competitive environment?  Did you walk away from any deals, from any more price aggressive competitors or anything in the competitive front that may have changed versus last quarter?

Defendant Thomas:  Sanjit, no, I don't think so.  **We've had a very consistent win rate in the competitive world of pretty much 8 to 9 times out of 10.  So it didn't change for us.  I think, as I said earlier, we had about the same number of deals in the greater-than-$1 million category.**  They all weren't quite as large as other deals we've seen sometimes in the greater-than-$1 million category.  But in a competitive environment, we have basically – we face BlueCat.  We have the same win rate.  Haven't seen it go down, and probably you can tell that from our increased gross margin.  I mean, **we haven't had to discount any more than we have in the past to win deals and its suck at about the same level.**  (Emphasis added).

63.    The projections were unreasonable based on market demand, including but not limited to, the weakening demand from the federal government.  On its November 26, 2013 Earnings Call, the following exchange occurred between Defendant Thomas and analyst Alex Kurtz from Sterne Agee & Leache Inc.:

Kurtz: Okay.  And last question, how have you guys forecasted the U.S. federal into this quarter, given that there's a January 15 deadline coming up and could create some continued pause out of that sector?

Defendant Thomas:  No change for us.  Again, and I think I said in the past that because we're a relatively small company, I think we can navigate around some of these things.  Of course, there will always be something we can't navigate around, I guess.  But federal for us, we would expect to be business as usual for us.  So we haven't really forecasted any downturn in federal for this quarter.

64.    On December 6, 2013, filed its Quarterly Report for the period ended October 31, 2013, on Form 10-Q with the SEC.  The report was signed by Defendants Thomas and Canessa and incorporated and reiterated the Company's prior false and misleading financial results and disclosures.

65.    In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Thomas and Canessa, stating that the financial information contained in the Form 10-Q was accurate and it fairly presented, in all material respects, the financial condition and results of operations of the Company.  The Form 10-Q

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

contained additional certifications by Defendants Thomas and Canessa asserting that the report ***"does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"*** (Emphasis added).

### The Truth Regarding the Defendants' Wrongful Course of Conduct Begins to Emerge

66.     After the close of the financial markets on February 10, 2014, the Company announced that it was lowering its revenue due to weaker demand.  Specifically, the Company stated that weaker sales in January, fewer big-ticket deals and softer federal business led to the revenue shortfall.  Infoblox announced that it now expected to earn 30 to 34 cents per share on revenue of $250 million to $254 million for the full year, well below its previously forecasted earnings of 44 to 54 cents per share on revenue of $270 to $276 million.

67.     The February 10, 2014 Press Release stated the following:

Infoblox expects net revenue for the second quarter to be approximately $60 to $61 million, below the company's prior expectations of $65 to $66 million.  On a GAAP basis, the company expects net loss per diluted share for the second quarter to be in the range of $0.08 to $0.10.  Non-GAAP net income per diluted share for the second quarter is expected to be in the range of $0.10 to $0.12, compared with the company's prior expectations of $0.09 to $0.11 per diluted share.  All non-GAAP measures exclude estimates for stock-based compensation expenses, amortization of intangible assets and acquisition related expenses.  For the second quarter, non-GAAP net income per diluted shares differs from GAAP net loss per diluted share because it excludes stock-based compensation expense of approximately $11 million and intangible asset amortization expense of approximately $1 million.

These preliminary net revenue and earnings (loss) per share estimates are based on management's initial review of operations for the quarter ended January 31, 2014 and are subject to the completion of the company's customary quarterly closing and review procedures.

"The revenue shortfall in the second quarter was primarily attributable to three factors," said Robert Thomas, president and chief executive officer.  "First, while sales through the first two months of the quarter met our internal expectations, we experienced a much weaker January than expected.  Second, we had fewer $1 million-plus transactions in the quarter than we typically do.  Finally, our Federal business came in below our expectations.  While we are disappointed that we fell short of our financial expectations for the quarter,

we remain confident in our strategy, the large market opportunity, our competitive differentiation and the compelling value proposition our products deliver to customers."

**Updated Outlook**

Infoblox is also updating its outlook for the fiscal year ending July 31, 2014. The company now expects net revenue for the year to be approximately $250 million to $254 million, versus the company's prior expectations of $270 million to $276 million. The company expects non-GAAP net income to be in the range of $0.30 to $0.34 diluted earnings per share, compared with the company's prior expectations of $0.44 to $0.54 diluted earnings per share. This outlook is based on a number of assumptions that the company believes are reasonable at the time of this press release. Information regarding potential risks that could cause the actual results to differ from these forward-looking statements is set forth below and in Infoblox's filings with the Securities and Exchange Commission.

68.    Analysts were unsatisfied with the Company's answers, questioned management's credibility and noted that failure to conduct an immediate Conference Call with investors after the announcement – in keeping with Infoblox's historical practices – created the impression that the setback is a deeper issue than merely a few key deals slipping through the quarter.

69.    In particular, Sterne Agee analysts Alex Kurtz, Amelia Harris and Craig Jones stated in a research note after the second quarter of missed expectations, that the guidance ***"raises too many questions about the core growth drivers of the business and our confidence in management's ability to predict the larger deal pipeline."*** (Emphasis added).

70.    Investor's Business Daily also released an article titled "Infoblox Warning, 'Credibility Issues' Hit Stock" which stated the following, in relevant part:

> ***"The magnitude of the reset raises serious management credibility issues and implies that Infoblox may be facing more serious challenges beyond just a weak January close to the second quarter,"*** said Jason Ader, an analyst at William Blair & Co., in a research report. ***"While we do not believe competition was a factor in the miss, we worry that DDI demand could be choppier than we expected."*** (Emphasis added).

71.    Barron's also published a news article titled "Infoblox Plunges 48%: Street Ponders What Went Wrong; 'Fundamental Problems'?" that stated the following, in relevant part:

Shares of enterprise networking technology vendor Infoblox (BLOX) today closed down $15.95, or over 48%, at $17.19, steadily adding to losses all day long, after the company yesterday afternoon warned its fiscal Q2 revenue will come in below expectations, and cut its year view as well, citing a "much weaker January than expected, fewer large transactions, and weakness in Federal buying."

The stock received at least three downgrades today.  Although management in the press release explained three reasons for the shortfall, with formal results not due until February 26, analysts, especially the bulls, were straining today to piece together.  Estimates and price targets were slashed.

Among today's downgrades, Needham & Co.'s Alex Henderson cut his rating on the shares to Hold from Buy, writing that ***"without much more color from Infoblox and indications from BlueCat that they have not seen 'any slowdowns or issues in the market' and 'are still growing 26% plus minimum,' we have to conclude that there seems to be an execution problem at InfoBlox that could take time to resolve."*** (Emphasis added).

There are "fundamental problems" at the company, he thinks:

While we strongly believe there is a real market for IPAM and DDI, in our view the 5% implied Product Sales growth suggests a fundamental problem with execution at InfoBlox.  This is also suggested by continued strong growth at Blox's nearest competitor.  Without clarity on these issues, we cannot recommend the shares.

Henderson cut his estimates for this year to $253 million in revenue and 36 cents EPS from a prior $275.6 million and 51 cents.  For 2015, he cut his estimates to $301.5 million and 40 cents from a prior $334.4 million and 49 cents.

72.     In reaction to the unexpected revision, Infoblox's share price plummeted, dropping nearly 50% from $33.14 per share to $17.19 per share on February 11, 2014 on a very heavy trading volume – wiping out nearly $850 million in the Company's market capitalization in one day.

73.     On February 26, 2014, Infoblox issued a Press Release setting forth its financial results for its second fiscal quarter ended January 31, 2014.  The Press Release stated the following:

Total net revenue for the second quarter of fiscal 2014 was $60.9 million, an increase of 12% on a year-over-year basis.

On a GAAP basis, the Company reported a net loss of $4.4 million, or $0.08 loss per fully diluted share, for the second quarter of fiscal 2014, compared with a net

loss of $3.2 million, or $0.07 loss per fully diluted share, for the second quarter of fiscal 2013.

The Company reported non-GAAP net income of $6.6 million, or $0.11 diluted earnings per share on a non-GAAP weighted-average share basis, for the second quarter of fiscal 2014, compared with non-GAAP net income of $3.0 million, or $0.06 diluted earnings per share on a non-GAAP weighted average share basis, for the second quarter of fiscal 2013.  The GAAP to non-GAAP reconciling items for the second quarters of fiscal years 2014 and 2013 can be found in the "Reconciliation of GAAP to non-GAAP Financial Measures" attached to this press release.

The second quarter fiscal 2014 results reported today by the Company, both on a GAAP and non-GAAP basis, are in line with the preliminary second quarter financial results provided in the Company's press release on February 10, 2014.

"While we are disappointed in our second quarter financial results, we believe there are several strong secular trends from which we are continuing to benefit," said Robert Thomas, president and chief executive officer.  "The trends toward mobile devices, cloud computing, virtualization and next-generation data centers are placing incredible demands on networks worldwide.  And with the sharp increase in DNS-based attacks, we see a great opportunity in the security market.  We remain confident in our long-term strategy and are taking actions to improve our current growth trajectory."

**Financial Outlook**

Infoblox announced its outlook of anticipated results for the third quarter ending April 30, 2014 and affirmed its revenue and non-GAAP EPS outlook for the year ending July 31, 2014, given in the Company's press release on February 10, 2014. This outlook is based on a number of assumptions that it believes are reasonable at the time of this earnings release.  Information regarding potential risks that could cause the actual results to differ from these forward-looking statements is set forth below and in Infoblox's filings with the Securities and Exchange Commission.

For the third fiscal quarter ending April 30, 2014, the Company currently expects:

- Total net revenue in the range of $61 million to $62 million;

- Non-GAAP gross margin to be between 78% to 79%;

- Non-GAAP operating margin in the range of 2.5% to 3.5%; and

- Non-GAAP diluted net income per share ("non-GAAP EPS") to be in the range of $0.02 to $0.03, assuming approximately 57.7 million shares on a non-GAAP diluted weighted-average share basis.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

For the fiscal year ending July 31, 2014, the Company currently expects:

- Total net revenue in the range of $250 million to $254 million;

- Non-GAAP operating margin in the range of 7.5% to 8.5%; and

- Non-GAAP EPS to be in the range of $0.30 to $0.34, assuming approximately 57.5 million shares on a non-GAAP diluted weighted-average share basis.

74.    Infoblox held a Second Quarter Earnings Call on February 27, 2014 whereby Defendant Thomas admitted for the first time that Infoblox had been discounting enormously to get deals.   With respect to discounting, the following exchange occurred between Defendant Thomas and analyst Jason Ader from William Blair:

Blair: I guess what I'm trying to get at is, there are fewer million dollar part deals. January slowed down and you made that clear and you gave some analysis of the situation in terms of new customer acquisitions and some of the security stuff.

What I am getting at really is why you think January slowed down?  Why didn't you think more bigger deals didn't close?  Is there something else that happened? Is there something else that you looked at, because you obviously had the pipeline to support the forecast and the pipeline didn't play out the way you had hoped for, so I'm just trying to understand if there's anything else?  Is there some regional things that happened that you know is just – was it macro related, was there something else that you felt happening that hurt the business in the second quarter?

Defendant Thomas:  I don't think there is anything on the macro front that we saw. I think it was a surprise to us that the federal was significantly below where we expected it to be.  I mentioned earlier that it's the worst quarter we had in federal for two years and so we didn't expect that and in the next quarter or two, we don't expect that to improve much.

We do have a bit of a nagging feeling that as we add more product to what we saw in our larger deal, the security alongside DDI and got off the NetMRI as well and network automation side of it, but as we engage the other buying senders beyond just the network guys we normally sell to and we have to get other peoples buy in and other agreement that it can push the sales cycle up, so we feel that may be happening.

That may be a permanent trend if we're right and the sales cycle has been pushed out.  But as we deal with more pipeline in bigger deals and as we build that into the

overall forecasting process and general pipeline development, then it kind of takes care of itself by the time as we get more things into the pipe.

So nothing macro, I don't think and we mentioned we believe we're as competitive as we ever were.  Our gross margins as you can see were very good.  ***We were discounting enormously to get deals that was just standard business practices***, so we didn't leave any more to competition than we thought and it was just a number of things in Q2 that just happen to come together.  Perhaps this elongated sales cycles which caused less million dollar plus deals, federal disappointing beyond what we would definitely expect and then the north east as we said, which was somewhat affected by the larger deals to not getting to where we wanted them to be.

So a combination of things and nothing that threatens our normal business overall.  Well, I see demand is definitely not down.  We get just as much interest in the product.  In fact enquiries, lead generation enquiries are at an all time high in terms of number of enquiries we are generating over the last two or three months, because those haven't turned into deals yet, because they are enquiries.  But nothing that would cause us to indicate the market is saturated or there's no interest or customers are diverting dollars to other things.  (Emphasis added).

75. Although Defendant Thomas tried to dismiss this as a "standard" business practice, it is a material fact that may have altered investors' assessment of Infoblox's business model and impacted investors' decisions about whether to invest in Infoblox as would have Infoblox's timely disclosure that it was poised for a revenue drop based on a decrease in demand from the federal market. Immediately following this news, shares of Infoblox declined $0.88 per share, nearly 4%, to close on February 28, 2014, at $23.08 per share, on unusually heavy volume.

76. On March 7, 2014, Infoblox filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter.  The Company's Form 10-Q was signed by Defendant Canessa and reaffirmed the Company's financial results previously disclosed on February 26, 2014.

77. On May 29, 2014, after the close of the markets, Infoblox issued a press release announcing its financial results for the third quarter of fiscal 2014 ending April 30, 2014.  The May 29, 2014 Press Release stated the following, in relevant part:

Total net revenue for the third quarter of fiscal 2014 was $61.0 million, an increase of 5% on a year-over-year basis.

On a GAAP basis, the Company reported a net loss of $7.4 million, or $0.14 loss per fully diluted share, for the third quarter of fiscal 2014, compared with a net loss

of $0.3 million, or $0.01 loss per fully diluted share, for the third quarter of fiscal 2013.

The Company reported non-GAAP net income of $3.8 million, or $0.07 diluted net income per share on a non-GAAP weighted-average share basis, for the third quarter of fiscal 2014, compared with non-GAAP net income of $6.0 million, or $0.11 diluted net income per share on a non-GAAP weighted-average share basis, for the third quarter of fiscal 2013.

"Revenue for the third quarter was $61 million, which was at the low-end of our guidance range of $61 million to $62 million," said Robert Thomas, president and chief executive officer.  "While we made progress in a few areas of the company, we again experienced challenges in closing seven-figure transactions.  Clearly, our top priority is to reaccelerate top-line growth and we are taking actions to improve sales execution.  Importantly, we believe our competitive position continues to be strong and our addressable market is growing, and we are optimistic about the opportunities before us."

**Financial Outlook**

Infoblox announced its outlook of anticipated results for the fourth quarter ending July 31, 2014, and updating its outlook for the year ending July 31, 2014.  This outlook is based on a number of assumptions that it believes are reasonable at the time of this earnings release.  Information regarding potential risks that could cause the actual results to differ from these forward looking statements is set forth below and in Infoblox's filings with the Securities and Exchange Commission.

For the fourth fiscal quarter ending July 31, 2014, the Company currently expects:

- Total net revenue in the range of $60 million to $61 million;

- Non-GAAP gross margin to be between 78% to 79%;

- Non-GAAP operating margin in the range of 0.0% to 2.0%; and

- Non-GAAP diluted net income per share ("non-GAAP EPS") to be in the range of $0.00 to $0.02, assuming approximately 56.9 million shares on a non-GAAP diluted weighted-average share basis.

For the fiscal year ending July 31, 2014, the Company currently expects:

- Total net revenue in the range of $245 million to $246 million;

- Non-GAAP operating margin in the range of 7.5% to 8%; and

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Non-GAAP EPS to be in the range of $0.30 to $0.32, assuming approximately 57.1 million shares on a non-GAAP diluted weighted-average share basis.

78.    Immediately thereafter, on May 29, 2014, the Company issued a second Press Release announcing the resignation of Defendant Thomas.  The Press Release stated the following:

> Infoblox, the network control company, today announced that Robert Thomas has decided to step down as the company's president and chief executive officer. Thomas will remain in his present management and board positions pending the appointment of his successor.  Thomas joined Infoblox in September 2004 as director, president and chief executive officer.

> "Speaking on behalf of the entire board of directors, I would like to thank Robert for his leadership as CEO and his innumerable contributions to Infoblox," said Michael L. Goguen, chairman of the board of directors.  "Under Robert's leadership, Infoblox has developed a strong brand awareness in the DDI marketplace, delivered innovative new products and is well positioned for long-term success.  While we would be pleased if he would continue as CEO, the board respects his desire to pursue other personal and professional goals.  With Robert's encouragement, we have decided that it makes sense to immediately start the search for a successor."

> "We have accomplished a tremendous amount over the past ten years, and I am very proud of our entire team," said Robert Thomas, president and chief executive officer.  "Today, we have strong customer relationships, leading technologies and deep management talent.  I am confident the board will select a world-class leader to continue to grow the company, and build on the strong base we have in place today.  I remain fully committed to leading Infoblox and ensuring the succession process is seamless."

> The Board has engaged an executive search firm to assist in the process of contacting and evaluating candidates.

79.    Immediately following this news, shares of Infoblox declined $7.56 per share, nearly 37%, to close on May 30, 2014, at $12.96 per share, on unusually heavy volume.

80.    On June 3, 2014, the Company issued a Press Release announcing the appointment of Philip Fasano to Infoblox's board of directors.

## ILLEGAL INSIDER SELLING

81.    Defendants Thomas, Canessa, Goguen, Gerson, Marshall and Phelps (the "Insider Trading Defendants"), based on their knowledge and/or conscious disregard of material non-public

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  information regarding the Company, dumped millions of dollars of Company stock while the stock
2  price was artificially inflated.

3  82.  Additionally, five of the six Insider Trading Defendants are either current or former
4  members of Infoblox's Board.

5  83.  Defendant Thomas, the Company's President, CEO and Director, sold over 207,000
6  shares for proceeds of almost $9 million.

7  84.  Defendant Goguen, the chairman of the Board, sold over 316,000 shares for
8  proceeds of almost $10 million during the Relevant Period, reducing his Company holdings from
9  approximately 350,000 shares to a mere 35,000 shares, which represent only 10% of the number of
10  shares he held at the start of the Class Period.

11  85.  Three other directors, Defendants Gerson, Phelps and Marshall, sold out their entire
12  Company holdings during the Class Period, leaving them with no Infoblox shares by the end of the
13  Class Period.

14  86.  Of these five Defendants, Defendants Thomas, Goguen, Gerson and Phelps are
15  current directors of the Company. These four current directors constitute a majority of the Board.

16  87.  In total, the five Defendant Directors sold over 557,000 shares of Company stock
17  and received almost $20 million in proceeds.

18  88.  The five other members of senior management, excluding Defendant Thomas, sold
19  over 535,000 shares of Company stock for proceeds of almost $20 million.  They include the
20  following:

21  a)  Defendant Canessa (CFO);

22  b)  Christopher J. Andrews (EVP, Worldwide Field Ops);

23  c)  David Nicholas Gee (EVP, Marketing);

24  d)  Wendell Stephen Nye (EVP, Product Strategy); and

25  e)  Sohail M. Parekh (EVP, Engineering).

26  89.  In total, the Company's senior management and Board sold almost $40 million in
27  stock during the Class Period.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

90.     The Individual Defendants, through their attendance at Board meetings, Audit Committee meetings, management meetings, and conversations with the Company's management, knew and/or consciously disregarded that Infoblox was discounting heavily to attract business.

91.     In breach of their fiduciary duty of good faith, and, with respect to the Audit Committee Defendants, their fiduciary responsibilities as members of the Audit Committee, the Individual Defendants knowingly caused and/or willfully approved and in some instances directly participated in making the Company's false and misleading statements, either knew, consciously disregarded or acted with gross negligence in ignoring the obvious and pervasive problems with the Company's lack of full and fair disclosure, and failed to make a good faith effort to correct or prevent the recurrence of the improper conduct.

92.     Furthermore, as a direct and proximate result of the Individual Defendants' misconduct, Infoblox has suffered damages, including but not limited to:

93.     Costs incurred from investigating, defending and payment of any settlement or judgment in the Securities Class Actions;

94.     Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Infoblox;

95.     The illicit profits from the Insider Trading Defendants; and

96.     Costs incurred from the loss of Infoblox's customers' confidence in the Company's services.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

97.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

98.     Plaintiff is a shareholder of Infoblox, was a shareholder of Infoblox at the time of the wrongdoing alleged herein, and has been a shareholder of Infoblox continuously since that time.

1   99.   Plaintiff will adequately and fairly represent the interests of the Company and its

2   shareholders in enforcing and prosecuting its rights.

3   100.   As a result of the facts set forth herein, Plaintiff has not made any demand on the

4   Infoblox Board to institute this action against the Individual Defendants.  Such a demand would be

5   a futile and useless act because a majority of the current Board are incapable of making an

6   independent and disinterested decision to institute and vigorously prosecute this action.

7   101.   At the time of the filing of this complaint, the Board of Infoblox consists of the

8   following seven individuals: Defendants Thomas, Phelps, Belluzzo, Goguen, Gerson, Conigliaro

9   and non-defendant Philip Fasano.  All of the Current Director Defendants, with the exception of

10   Mr. Fasano, have been named as Individual Defendants herein. Four of the Current Director

11   Defendants (Thomas, Phelps, Goguen and Gerson) engaged in insider trading and therefore, are

12   incapable of impartially considering a demand on the Board. Defendants Thomas, Phelps, Goguen

13   and Gerson constitute a majority of the current Board.

14   102.   The unlawful acts and practices alleged herein cannot be defended by the Current

15   Director Defendants and are not subject to the protection of any independent business judgment

16   since it would undoubtedly be in the Company's best interests to recover the damages caused by

17   the Individual Defendants' wrongdoings and to assert these derivative claims.

18   103.   Demand is excused because the wrongs alleged herein constitute violations of the

19   fiduciary duties owed by the Current Director Defendants.  The Current Director Defendants are

20   subject to liability for breaching their fiduciary duties to the Company by, among other things,

21   causing Infoblox to pursue an improper, unethical, and illegal course of conduct in its business

22   practices, as discussed above.

23   104.   The Current Director Defendants' wrongful conduct was continuous and occurred

24   throughout the applicable time period.  It resulted in an ongoing and continuous harm to the

25   Company.  The Director Defendants participated in and/or failed to adequately address, correct

26   and/or disclose such conduct.

27

28

**Defendants Face a Substantial Likelihood of Liability**

105.    Demand is excused because the Current Director Defendants face a substantial likelihood of liability in this action as a result of their acts alleged herein.

106.    In addition, the Current Director Defendants face a substantial likelihood of liability and have caused Infoblox to face a substantial likelihood of liability from the Securities Class Actions filed against Infoblox, which allege that the Company and its senior executives issued false and misleading statements and omissions, including the following:

- "We enter fiscal 2014 with significant momentum and expect it to be another year of strong execution."

- "For our fiscal year 2014, we expect revenue to be in the range of $270 million to $276 million or a year-over-year growth of 20% to 23%.  We anticipate operating margin to be between 10% to 12%.  We expect EPS to be in the range of $0.44 to $0.55, using 57.3 million shares."

- "I am pleased with our results and the strong start to fiscal 2014.  In the first quarter, revenue increased 28% year-over-year to a record $63.5 million, and product revenue grew 33% year-over-year to $36.0 million."

- "We executed well in the first quarter and saw a solid year-over-year revenue growth in all three geographies."

- "We have the same win rate.  Haven't seen it go down, and probably you can tell that from our increased growth margin.  I mean, we haven't had to discount any more than we have in the past to win deals and it's stuck at about the same level."

107.    By their wrongful acts and omissions, the Current Director Defendants were unjustly enriched at the expense of and to the detriment of Infoblox.  The Current Director Defendants received compensation and director remuneration at the same time in which they were breaching their fiduciary duties owed to the Company.  Further, Defendants Thomas, Goguen, Gerson and Phelps capitalized on these false and misleading representations by selling their shares on the open market for a substantial profit.

108.   The Current Director Defendants also wasted corporate assets by paying improper compensation, bonuses and severance to certain of the Company's executive officers and directors. These handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

109.   In addition, demand is also excused because the Current Director Defendants engaged in or ratified the wrongdoing alleged herein as these defendants reviewed, prepared, signed, or had access to the materially false and misleading press releases, SEC filings, and financial statements described herein.   All of the pertinent information regarding Infoblox's operations, business and prospects was provided to the Current Director Defendants and it was the duty of these Defendants to properly evaluate this information and provide thorough guidance and governance to the Company.   As such, these Defendants cannot be expected to prosecute claims against themselves and/or persons or entities with whom they have extensive inter-related businesses and professional and personal entanglements, including the Individual Defendants, if Plaintiff demanded that they do so.   The Current Director Defendants, because of these relationships (as further described below), have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of Infoblox.

110.   The Current Director Defendants' making or authorization of false and misleading statements throughout the Class Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's disclosures were accurate and that sufficient internal controls were in place regarding the accuracy of the Company's disclosures and statements concerning the Company's guidance, failure to take necessary and appropriate steps to ensure that the Audit, Compensation and Nominating and Governance Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Current Director Defendants face a substantial likelihood of liability.  If the Current Director Defendants were to bring suit on

1   behalf of Infoblox to recover damages sustained as a result of this misconduct, they would expose

2   themselves to significant liability.  This is something they will not do.  For this reason, demand is

3   futile.

4   **The Audit Committee Defendants Face a Substantial Likelihood of Liability**

5          111.    The Audit Committee Defendants – Gerson, Conigliaro and Phelps – as members of

6   the Audit Committee, were responsible for reviewing the Company's financial reports.  Indeed,

7   Infoblox's Audit Committee Charter stated that the Audit Committee Defendants are charged with

8   maintaining "[t]he integrity of the financial statements of the Company" and "[t]he integrity,

9   effectiveness and adequacy of the Company's accounting and financial reporting processes and

10  systems of internal control."

11         112.    The Audit Committee Defendants breached their fiduciary duties by failing to

12  perform their designated duties and responsibilities as delineated in the Audit Committee Charter

13  by causing and failing to identify, detect, and prevent material misstatements in the Company's

14  financial systems, and failing to put in place or maintain proper internal controls.  As a result of

15  their breaches of duties of good care, good faith, and loyalty, the Audit Committee Defendants

16  face a substantial likelihood of liability such that any demand upon them is futile.

17  **The Compensation Committee Defendants Face a Substantial Likelihood of Liability**

18         113.    The Compensation Committee Defendants – Defendants Goguen, Belluzzo and

19  Gerson – as members of the Compensation Committee during the Relevant Period, are/were

20  responsible for evaluating and approving the operation, structure and effectiveness of the

21  Company's compensation plans, programs and policies.  In furtherance of these obligations, the

22  Compensation Committee consulted with the Board regarding the Company's risk exposures and

23  whether the Company's compensation plans, policies and practices created risks that were likely to

24  have a material adverse effect on the Company.

25         114.    The Compensation Committee Defendants breached their fiduciary duties by failing

26  to perform their designated duties and responsibilities as delineated in the Compensation

27  Committee Charter by approving generous bonuses for Defendants Thomas and Canessa which

28

1   were based upon the successful financial performance of the Company. As a result of their

2   breaches of fiduciary duties, the Compensation Committee Defendants face a substantial

3   likelihood of liability such that any demand upon them is futile.

4   **The Director Defendants Lack Independence**

5   115.   Demand is also excused because the Current Director Defendants are incapable of

6   independently and disinterestedly considering a demand to commence and vigorously prosecute

7   this action as a result of their participation in or approval in the wrongs alleged herein in addition

8   to the following set of facts, which taken as a whole, unequivocally show that the Current Director

9   Defendants have conflicts of interest and lack sufficient independence to exercise business

10  judgment.

11  116.   As a result of their access to and review of internal corporate documents;

12  conversations and connections with other corporate officers, employees and directors; and

13  attendance at Board and committee meetings, each of the Current Director Defendants either knew,

14  consciously disregarded, was reckless or grossly negligent in not knowing or should have known

15  the true facts regarding the adverse, non-public information regarding the Company's financial

16  performance and future prospects.   While in possession of this material adverse, non-public

17  information regarding the Company, the following current members of the Infoblox Board

18  participated in illegal insider selling:

19          a.   During the Class Period, Defendant Thomas sold 207,565 shares of Infoblox stock

20               for proceeds of $8,849,507;

21          b.   During the Class Period, Defendant Goguen sold 316,152 shares of Infoblox stock

22               representing 90% of his holdings for proceeds of $9,932,016;

23          c.   During the Class Period, Defendant Gerson sold 11,000 shares of Infoblox stock

24               representing 100% of his holdings for proceeds of $391,950; and

25          d.   During the Class Period, Defendant Phelps sold 7,000 shares of Infoblox stock

26               representing 100% of his holdings for proceeds of $249,200.   Because these

27               Defendants received a personal financial benefit from the challenged insider trading

28

transactions, these Defendants are interested. Also, these Defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling. Since these Directors have breached their fiduciary duties and are interested, any demand upon them is futile.

117.    Infoblox's non-employee directors receive substantial compensation in the form of annual retainers, stock option grants and Board and committee fees. Specifically, during FY:13, Infoblox paid defendant Belluzzo $329,784, paid defendant Conigliaro $186,308, paid defendant Gerson $200,308, paid defendant Goguen $196,558 and paid defendant Phelps $182,558. Accordingly, defendants Belluzzo, Conigliaro, Gerson, Goguen and Phelps are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and unvested stock options. Thus, demand upon these Defendants is futile.

## COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duty
in Connection with Their Dissemination of
False and Misleading Information**

118.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.    The Individual Defendants owed and owe Infoblox fiduciary obligations, including the obligations of good faith, fair dealing, loyalty and care.

120.    Among other things, the Individual Defendants owed a fiduciary duty to Infoblox to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate and conformed to federal and state securities law. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Infoblox's disclosures concerning the Company's financial performance and future prospects, including its financial guidance and by allowing materially false and misleading statements and filings to be issued.

121.    By reason of the foregoing, Infoblox was damaged.

**COUNT II**

**Against the Individual Defendants for Waste of Corporate Assets**

122.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

123.   Defendants breached their fiduciary duties by failing to properly supervise and monitor InfoBlox by allowing the Company to engage in an illegal, unethical and improper course of conduct.

124.   As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duties, Infoblox has wasted valuable corporate assets through payments of compensation to themselves because the Company has incurred and will continue to incur significant potential liability for legal costs, penalties, fines and/or legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein.

125.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

126.   By reason of the foregoing, Infoblox was damaged.

**COUNT III**

**Against Defendants Thomas, Goguen, Gerson and Phelps for Breach of Fiduciary Duties for Insider Trading and Misappropriation of Information**

127.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

128.   At the time of the stock sales set forth herein, the Defendants knew and/or consciously disregarded the information described above, and sold Infoblox common stock on the basis of such information.

129.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

asset belonging to the Company, which the Defendants used for their own benefit when they sold Infoblox common stock.

130.    The Defendants' sales of Infoblox common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

131.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on those sales consummated through the exercising of Company options by the Defendants.

## COUNT IV

### Against the Individual Defendants for Gross Mismanagement

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth at length herein.

133.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Infoblox in a manner consistent with the operations of a publicly held corporation.

134.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Infoblox has sustained significant damages.

135.    As a result of the misconduct and breaches of fiduciary duty alleged herein, the Individual Defendants are liable to the Company.

136.    Plaintiff on behalf of Infoblox has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

137.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

138. By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Infoblox.

139. Plaintiff, as a shareholder and representative of Infoblox, seeks restitution from these defendants, and each of them, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B. Directing Infoblox to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Infoblox and its shareholders from a repeat of the damaging events that occurred during the Relevant Period;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets to assure that Plaintiff on behalf of Infoblox has an effective remedy;

D. Awarding to Infoblox restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation wrongfully obtained by the Defendants;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, consultants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as this court deems just and proper.

///

///

1

## JURY DEMAND

2

Plaintiff demands a trial by jury of all claims in this Complaint that are so triable.

3

DATED:  November 19, 2014                    Respectfully submitted,

4

5

By: /s/ David E. Bower

6

David E. Bower
**FARUQI & FARUQI, LLP**

7

10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024

8

Telephone: (424) 256-2884
Facsimile:  (424) 256-2885

9

Email: dbower@faruqilaw.com

10

*Attorneys for Plaintiff*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    **VERIFICATION**

2    STATE OF GEORGIA

3    COUNTY OF _____Glynn_____

4    Korey Burnam, being duly sworn, deposes and says:

5          I am the plaintiff in this action. I am a shareholder of Infoblox, Inc. (the "Company"), and
6    am ready, willing, and able to pursue this action in the hope of improving the Company and
     recovering damages for the Company caused by the defendants' conduct. I have reviewed the
7    allegations made in this Verified Shareholder Derivative Complaint and to those allegations of
8    which I have personal knowledge I believe those allegations to be true. As to those allegations of
     which I do not have personal knowledge, I rely upon my counsel and their investigation and
9    believe them to be true. Having received a copy of this Complaint, having reviewed it with my
10   counsel, I hereby authorize its filing.

11   By: _____
12        Korey Burnam

13

14   Sworn to before me this __18__ day of __Nov__, 2014

15

16   _____
17   Notary Public

     JUSTIN W. DOWNS
     Notary Public
     Glynn County
     State of Georgia
     My Commission Expires Jan 31, 2015

18

19

20

21

22

23

24

25

26

27

28                                    VERIFICATION